**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

**----------------------------------------------------------x**

| | | |
|---|---|---|
| **WINSTON JAMES** | : | |
| **Plaintiff,** | : | |
| **-against-** | : | **1:24-cv-1517 (ALC)** |
| **KELLY SERVICES ET AL** | : | |
| | : | **<u>ORDER & OPINION</u>** |

**----------------------------------------------------------x**

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Winston James brings this action against Defendants Assurant, Inc. and Kelly Services, Inc. for race discrimination in violation of Section 1981 and race discrimination in violation of the NYC administrative code. Defendants move for summary judgment. For the reasons stated below, Defendants' motion is granted.

## BACKGROUND[1]

### Parties

Defendant Assurant is a global provider of risk management products and services. D. Stmt. ¶ 8. In 2021, Assurant became T-Mobile's exclusive provider of premium handheld device insurance and related repair services. *Id.* ¶ 9.[2] To meet its obligations to T-Mobile, Assurant had only three months to hire, place, and train approximately 2,300 new employees across 560 T-Mobile stores. *Id.*

---

[1] This section is drawn from the Complaint, *see* ECF No. 1, Plaintiff's Statement of Undisputed Material Facts submitted pursuant to Local Civil Rule 56.1, *see* ECF No. 78 ("Pl. Stmt."), Defendants' Statement of Undisputed Material Facts, *see* ECF No. 71. ("D. Stmt."), and the summary judgment briefing.

[2] Another company, called Asurion, was T-Mobile's insurance and service and repair partner prior to Assurant. D. Stmt. ¶ 30. Plaintiff worked for Asurion in a T-Mobile store from about 2000 through May 2022. *Id.* ¶¶ 28, 31, 93.)

¶ 10. Assurant retained Defendant Kelly Services, an international staffing agency, to assist with the recruitment process in July 2021. *Id.* ¶¶ 14, 16. Kelly Services was to source candidates, conduct screener interviews of candidates, and advance qualified candidates to Assurant for further interviews and consideration. *Id.* ¶ 16.

**Facts**

Qualified candidates would then be scheduled to interview with a member of Assurant's team. *Id.* ¶ 16. Lead Tech candidates were interviewed by recently hired Assurant District Managers ("DMs"). *Id.* ¶ 25. Since Assurant had to hire a large number of DMs and Lead Techs simultaneously in a short period of time, most Lead Tech candidates were interviewed by DMs that were recently hired by Assurant to work in a geographical market different from the candidate being interviewed. *Id.* ¶ 26. The result was that most Lead Tech candidates were interviewed by DMs that would not have been their direct manager if they were hired. *Id.* ¶ 27. Qualified candidates for the DM positions were also scheduled to interview with a member of Assurant's team. *Id.* ¶ 16.

Assurant's employment application seeks the voluntary disclosure of protected characteristic information (*Id*. 12), but Assurant ensures that its hiring managers do not have access to voluntary disclosures made in connection with employment applications. *Id.* ¶¶ 13, 19.)

Since Assurant only had three months to build out its team for the T-Mobile project, Assurant immediately began interviewing, hiring and onboarding DMs so that the new DMs could begin interviewing and hiring Lead Techs to lead each T-Mobile store. *Id.* ¶ 21. However, because it was so early in the hiring process, Assurant was hiring DMs without knowing exactly which stores would be transitioned to Assurant, and without knowing exactly which stores would make up each district. *Id.* ¶ 22. Once Assurant hired enough DMs to facilitate the interviews and hiring of Lead Techs, Assurant placed a hiring freeze on all open DM positions in August 2021 to permit T-Mobile time to

provide an accurate roster of stores and to permit Assurant to break the stores into districts. *Id.* ¶ 23. After the hiring freeze was initiated, open DM requisitions were closed. *Id.* ¶ 24.

Plaintiff submitted his application to the open DM position on August 4, 2021, and Defendants scheduled Plaintiff for interviews for the DM position on August 9, 2021, and August 12, 2021.

After Jonathan Senquiz was hired as a DM, he visited the T-Mobile stores that would be within his district once the transition from Asurion to Assurant was complete. *Id.* ¶ 63. One of the stores Senquiz visited was on Fulton Street in Brooklyn—the same Asurion/T-Mobile store at which Plaintiff was working as a Lead Tech. *Id.* ¶¶ 28, 63-64. Plaintiff was not working the day Senquiz visited the store, and Senquiz did not see any picture of Plaintiff on any of the store's walls. *Id.* ¶¶ 69, 70. In fact, Plaintiff had not yet been scheduled to interview by Senquiz at the time Senquiz visited the location. *Id.* ¶ 55.

The manager of the Fulton Street store shared with Senquiz feedback concerning the store's employees, including Plaintiff, and specifically told Senquiz that Plaintiff was good at repairing phones but was not good at handling customer interactions. *Id.* ¶ 65. The manager also told Senquiz that Plaintiff had issues with tardiness and making it to work. *Id.* Additionally, Senquiz noticed that the tech room and the tech inventory, which was the responsibility of the Lead Tech, was disorganized. *Id*. ¶ 66. Senquiz took all of the information he learned "with a grain of salt" because he had not yet interviewed Plaintiff or the other the Asurion employees at the Fulton Street store. *Id*. ¶ 67. Senquiz figured he would eventually cross paths with Plaintiff because most Asurion employees were applying to work for Assurant. *Id.* ¶ 68. Other than the information he learned from the Fulton Street store manager, Senquiz did not learn any other information about Plaintiff from any other person. *Id.* ¶ 70.

In August 2021, Plaintiff applied for two positions with Assurant through Assurant's online portal, (1) DM and (2) Lead Tech. *Id.* ¶ 32. The DM role oversees operations and provides management to repair technicians and other employees across ten to twelve T-Mobile retail stores. *Id.* ¶ 33. The Lead Tech role requires "engaging with customers to explore device issues, repairing mobile devices and determining warranty adjudication," engaging in "various inventory tasks," and other responsibilities. *Id.* ¶ 34. The Lead Tech is the "face of Assurant[']s in-store operations delivering [its] award winning customer resolution experience." *Id.* ¶ 35. The Lead Tech also serves as the "front line" manager for Field Repair Technicians. *Id.* ¶ 36.

Plaintiff submitted a copy of his resume along with his applications. *Id*. ¶ 37. The resume did not disclose Plaintiff's race. *Id*. Plaintiff's applications were then forward to Kelly Services' personnel for consideration and screening. *Id.* ¶ 41. George Zeinhert, a recruiter for Kelly Services, was assigned Plaintiff's DM application, and Connor Ignerowski, another recruiter for Kelly Services, was assigned Plaintiff's Lead Tech application. *Id.*

On August 5, 2021, Zeinhert texted Plaintiff regarding the DM position. *Id.* ¶ 42. Later that day, Plaintiff participated in the initial screener interview for the DM position with Zeinhert. *Id.* ¶ 43. The interview was telephonic with no video component and lasted approximately twenty minutes. *Id.* Zeinhert did not ask Plaintiff his race during the screener interview. *Id.* ¶ 45. After the screener interview, Zeinhert recommended that Assurant advance Plaintiff's application for the DM position to the next stage—a callback interview with Assurant. Id. ¶ 44. On August 7, 2021, Zeinhert texted Plaintiff to "keep an eye on your email for interview confirmation," referencing an August 9, 2021, callback interview with Assurant's Willis Aybar. *Id.* ¶ 46. Despite acknowledging Zeinhert's message, Plaintiff failed to appear for the callback interview on August 9, 2021. *Id.* ¶ 47.

The callback interview was ultimately rescheduled for August 12, 2021, at 11 a.m. *Id.* ¶ 48. Mark Smith from Assurant provided Plaintiff with his cell phone number and wished Plaintiff "[g]ood luck on August 12, 2021!" *Id.* ¶ 49. On the morning of August 12, 2021, Smith texted Plaintiff to remind him of the DM callback interview scheduled for 11 a.m. and confirmed that the interview invitation was sent to the email address Plaintiff listed on his applications. *Id.* 56. Despite the reminder, Plaintiff again failed to appear for the callback interview. *Id.* ¶ 57. Ten minutes after the interview was scheduled to begin, Plaintiff texted Smith and asked him to resend the interview invitation to a different email address. *Id*. ¶ 58. Smith told Plaintiff that Zeinhert would be in touch to reschedule the DM interview (for the third time). *Id*. ¶ 59. Zeinhert went on vacation for two of the three business days following the second missed callback interview. *Id.* ¶ 80.

On August 18, 2021, the day Zeinhert returned from vacation, Plaintiff contacted Zeinhert to re-schedule the callback interview for the DM position. *Id*. ¶¶ 81. However, the callback interview was not rescheduled for a third time because Assurant had placed a hiring freeze on all open DM positions and later cancelled the DM position Plaintiff applied for. *Id*. ¶¶ 23, 24, 82, 83. Due to the hiring freeze, Assurant rejected Plaintiff's application and all other pending applications for the DM position. *Id*. ¶ 84.

Regarding the Lead Tech position, on August 11, 2021, Ignerowski called Plaintiff to conduct the screener interview. *Id*. ¶ 50. However, Plaintiff did not pick up Ignerowski's call. *Id*. Ignerowski and Plaintiff subsequently exchanged text messages concerning Plaintiff's compensation expectations for the Lead Tech position. *Id*. ¶ 51. Plaintiff only communicated with Ignerowski over text message. *Id*. ¶ 52. Plaintiff never disclosed or discussed his race with

Ignerowski. *Id.* ¶ 53. Based on the text messages, Ignerowski advanced Plaintiff's Lead Tech application to a callback interview with Assurant's Jonathan Senquiz. *Id*. ¶ 54.

On August 12, 2021, Senquiz interviewed Plaintiff for the Lead Tech position. *Id*. ¶ 71. The interview was telephonic with no video component. *Id*. Senquiz immediately got the impression that Plaintiff felt the Lead Tech position was beneath him and that he was only truly interested in the DM position. *Id*. ¶ 73. Additionally, Plaintiff's responses to several of Senquiz's interview questions gave Senquiz the impression that Plaintiff would be unable to manage complexities, manage change, and be an effective leader. *Id*. ¶ 73-75, 77-78. Plaintiff was also challenging many of Senquiz's questions. *Id*. ¶ 78. Specifically, in response to Senquiz's request that Plaintiff describe a time where Plaintiff had a disagreement with a co-worker and how he moved past it, Plaintiff simply stated, "[w]ell, is it the problem with the policy or is it the problem with the person?" *Id*. ¶¶ 74-75. Plaintiff's response was off-putting to Senquiz. *Id*. ¶ 76.)

Given the interview, Senquiz ultimately decided not to hire Plaintiff for the Lead Tech position. *Id.* ¶¶ 86-87.) However, Senquiz noted in his feedback that Plaintiff is "tech savvy" and "knows how to pull apart phones in 30 minutes." *Id*. ¶ 88.) Senquiz also noted that Plaintiff had leadership potential, but that a Repair Technician role—which Plaintiff did not apply for—would be more fitting for Plaintiff. *Id*. Senquiz did not learn of Plaintiff's race until he was notified of the lawsuit. *Id*. ¶¶ 89-90.

During Senquiz's time at Assurant, Senquiz had eight Lead Techs reporting to him. *Id.* ¶ 95. Of those eight Lead Techs, four of them identify as "Black or African American (Not Hispanic or Latino)." *Id*. ¶ 96.) Senquiz interviewed and hired two of the Lead Techs who identify as "Black or African American (Not Hispanic or Latino)", De Anna Navarro-Thomas

and Marvin St. Louis, and interviewed and promoted another, William Lopes. *Id.* ¶ 97. Senquiz was aware of Lopes race when he promoted him to a Lead Tech position. *Id.* ¶ 98.)

The remaining Lead Techs on Senquiz's team, including Federica Bautista and Eric Sanchez, were interviewed and hired by other Assurant hiring managers. *Id*. ¶¶ 99-100.) Sanchez was ultimately hired for the Lead Tech position Plaintiff applied for, though he was not interviewed or hired by Senquiz. *Id.* ¶ 100. Another Lead Tech identified by Plaintiff, Crystania Rodriguez, was not on Senquiz's team and was not interviewed or hired by Senquiz. *Id*. ¶ 101.

Overall, forty of the forty-one (97.5%) employees supervised by Senquiz identify as racial or ethnic minorities. *Id.* ¶ 102. Of those forty-one employees, twenty identify as Black or African American. *Id.* ¶ 103. In other words, almost fifty percent of employees supervised by Senquiz identify as Black or African American. *Id.*

**Procedural History**

On January 11, 2024, Plaintiff filed a Complaint in the Supreme Court of the State of New York, New York County. On January 29, 2024, Defendants were served with the Complaint. On February 28, 2024, Defendants removed the case to this Court. ECF No. 1. On November 3, 2025, Defendants filed their Motions for Summary Judgment. ECF Nos. 72, 74. On November 21, 2026, Plaintiff filed his Opposition. ECF No. 77. On December 2, 2025, Defendants filed their Replies. ECF Nos. 80, 81.

## STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). Material facts

are those that may affect the outcome of the case. *See Anderson*, 477 U.S. at 248. Speculation, conclusory allegations, and mere denials are not enough to raise genuine issues of fact. *See National Union Fire Ins. Co. of Pittsburgh, Pa. v. Walton Ins. Ltd.*, 696 F. Supp. 897, 900 (S.D.N.Y. 1988). An issue of fact is "genuine" when a reasonable fact finder could render a verdict in the nonmoving party's favor. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation omitted).

At summary judgment, the moving party has the burden "to demonstrate that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). A movant "may discharge its burden by showing that the nonmoving party has 'failed to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 383 (S.D.N.Y. 2023) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"To avoid summary judgment, a party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Gallo*, 22 F.3d at 586. When the moving party has met its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Simsbury-Avon Pres. Soc'y LLC v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim. In that event, the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial." *Id.*

In deciding a summary judgment motion, courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Niagara Mohawk Power Corp. v. Jones Chemical Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Courts may not assess credibility, nor may they decide between conflicting versions of events because those matters are reserved for the jury. *See Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Id.* (citing *Anderson*, 477 U.S. at 252).

**DISCUSSION**

In order to establish a *prima facie* case of employment discrimination under Section 1981, a plaintiff must show that "(1) [plaintiff] is part of a protected racial group; (2) [plaintiff] was qualified for [the] position; (3) [plaintiff] suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action suggests an 'inference of discriminatory motivation.'" *See Lyu v. Alfa Chemistry Inc.*, 2025 U.S. Dist. LEXIS 70004, at *11 (E.D.N.Y. April 13, 2025) (quoting and citing *Littlejohn v. City of New York*, 795 F.3d 297, 311-12 (2d Cir. 2015)).

Furthermore, the Supreme Court has found that "a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation," and this requirement "extends to federal antidiscrimination laws like § 1981." *Meilus v. Rest. Opportunities Ctr. United, Inc.*, 2021 U.S. Dist. LEXIS 199605, at *22 (S.D.N.Y. 2021) (quoting *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S.Ct. 1009 (2020)). For a plaintiff to prevail on a § 1981 claim, the plaintiff must plead and prove that "but for race, [the plaintiff] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 589 U.S. 327, 341 (2020).

## I. Plaintiff has not made out a *prima facie* case of discrimination by Defendant Assurant.

Plaintiff claims that Defendant Assurant discriminated against him based on his race in its decision not to hire him for the Lead Tech position or as a DM.

### A. Lead Tech Position

Plaintiff has failed to make out a *prima facie* case of race discrimination for the Lead Tech position. "It is axiomatic that there can be no disparate treatment if the decision maker was unaware of a plaintiff's race at the time the adverse decision is made." *See Gass v. Evergreen Aviation Ground Logistics Enter.*, 07-cv-402 (ENV)(RER), 2008 U.S. Dist. LEXIS 134847, at *12 (E.D.N.Y. Oct. 15, 2008). From the record, it is undisputed that Senquiz, the decisionmaker on Plaintiff's application for the Lead Tech Position, did not have information about Plaintiff's race. D. Stmt. ¶ 13. All Senquiz received and reviewed prior to interviewing Plaintiff was a copy of Plaintiff's resume, which Plaintiff concedes does not disclose his race. *Id.* ¶ 61. It is also undisputed that Senquiz did not learn of Plaintiff's race when he visited the T-Mobile store on Fulton Street in Brooklyn because Plaintiff was not there and Senquiz never saw Plaintiff's picture on any wall of the store. *Id.* ¶¶ 63, 69. In his opposition, Plaintiff does not proffer any evidence to dispute Senquiz's testimony that he did not see a picture of Plaintiff on the wall. Plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (cleaned up). Plaintiff has failed to meet this burden.

Plaintiff concedes that Senquiz's interview with Plaintiff was conducted telephonically with no video component. *Id.* ¶71. It is undisputed that Senquiz did not learn Plaintiff's race until this lawsuit was filed. *Id.* ¶¶89-90. Therefore, the Court finds that Senquiz, as the only

decisionmaker with respect to the Lead Tech position, did not know Plaintiff's race when he rejected Plaintiff's application.

**B. DM Position**

Similarly to the Lead Tech position, Plaintiff provides no evidence that the decisionmaker for the DM position knew Plaintiff's race. Plaintiff concedes that he did not disclose his race to Zeinhert, his recruiter and primary contact for the DM position. *Id.* ¶ 45. There is no evidence that the Assurant employee who rejected Plaintiff for the DM position due to the hiring freeze ever spoke to Zeinhert about Plaintiff (or his race), or that the Assurant employee ever reviewed Plaintiff's application. Therefore, the Court finds that Plaintiff has not made out a case of *prima facie* discrimination with respect to the DM position. For this reason, Defendant Assurant's summary judgment motion is granted.

**II. Plaintiff has not made out a *prima facie* case of discrimination by Defendant Kelly Services.**

In order to make out a *prima facie* case of discrimination, a plaintiff must demonstrate that he suffered an adverse employment action. Defendant Kelly argues that because their role was limited to conducting and screening applications, Plaintiff did not suffer an adverse employment action related to them. "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." *Joseph v. Leavitt*, 465 F.3d 87, 90 (2d Cir. 2006). With regard to the DM position, Kelly conducted the initial screener interview of Plaintiff on August 5, 2021 and Kelly advanced him to the next round of interviews with Assurant. D. Stmt. ¶¶ 42-44. After Plaintiff missed his first interview for the DM position on August 9, 2021, Kelly readvanced and rescheduled him for the DM interview with Assurant on August 12, 2021. *Id.* ¶¶ 47-49, 56-57. From there, it was Assurant who decided to freeze hiring for the DM position. *Id.* ¶¶ 82-84.

For the Lead Tech role, on August 11, 2021, Kelly conducted a screener with Plaintiff via text and again advanced Plaintiff to the next round of interviews with Assurant. *Id.* ¶¶ 50-51, 54. Plaintiff attended his interview, and ultimately Assurant, not Kelly, did not choose him for the role. *Id.* ¶¶ 55, 71, 73-78, 86-87. Plaintiff does not respond to Kelly's argument that Kelly took no adverse action against him. The Court agrees with Kelly that because it took no adverse action, Plaintiff has failed to make out a *prima facie* case against Kelly. For this reason, Kelly's motion for summary judgment is granted.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate all pending motions.

**SO ORDERED.**

**Dated:** August 31, 2026

**New York, New York**

**ANDREW L. CARTER, JR.**

**United States District Judge**